# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7035 | **DATE** | 9/26/2003 |
| **CASE TITLE** | Williams vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set out in the Memorandum Opinion and Order, the Commissioner's motion for summary judgment [17-1] is denied, Plaintiff's motion for summary judgment [15-1] is granted, judgment is entered on behalf of Plaintiff, and the case is remanded to the Commissioner for further proceedings consistent with the Opinion. This is a final and appealable order. Terminating case.

*Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | SEP 29 2003 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | 22 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 9/26/2003 | |
| GR | courtroom deputy's initials | date mailed notice | |
| | | GR | |
| | | mailing deputy initials | |

U.S. DISTRICT COURT

03 SEP 29 AM 8:34

Date/time received in central Clerk's Office

JOHN W. WILLIAMS,            )
     Plaintiff,            )    Cause No. 02 C 7035
                 )
v.            )    Magistrate Judge Geraldine Soat Brown
                 )
JO ANNE BARNHART, Commissioner            )
of Social Security,            )
     Defendant.            )

SEP 2 9 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff John W. Williams ("Plaintiff") has brought an action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. § 423 *et seq.* Plaintiff first applied for DIB on January 24, 1995. (R. 93-97.)[1] That claim was denied initially and on reconsideration. (R. 99-102, 105-108.) Plaintiff apparently did not request a hearing. Plaintiff next applied for DIB on June 26, 1997. (R. 250-252.) That claim was denied initially on September 18, 1997, and Plaintiff apparently did not appeal. (R. 215-218.) Plaintiff filed another application for DIB on December 23, 1997. (R. 253-255.) The record contains an initial denial of an application for Supplemental Security Income ("SSI") dated February 23, 1998. (R. 219-222.) There is a denial of a request for reconsideration for DIB dated April 20, 1998. (R. 225-227.) That claim does not appear to have been further appealed.

Plaintiff's current application for DIB was filed on December 2, 1998, with a protective filing date of October 26, 1998. (R. 256-259.) Plaintiff's claim was denied initially on March 22, 1999. (R.

---

[1] "R.___ " refers to the certified record of proceedings, evidentiary documents, and administrative hearing transcripts prepared by the Social Security Administration's Office of Hearings and Appeals pursuant to 42 U.S.C. § 405(g).

228-231.) Plaintiff's request for reconsideration was denied on September 23, 1999. (R. 235-237.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 240.)

Although Plaintiff appears to have sought to have the 1997 application reopened (R. 41; Pl.'s Mem. at 3), the ALJ did not address that issue and reached his conclusion without reference to Plaintiff's prior applications. The Commissioner, however, states that "as Plaintiff was found not disabled at any time since March 1997 [the beginning of the disability period used by the ALJ], there would have been little point in formally reopening the December 1997 application." (Def.'s Mem. at 1, n. 1.) Plaintiff does not allege any specific prejudice from the failure to reopen his application.

The ALJ issued an unfavorable decision on June 30, 2000. (R. 23.) Plaintiff's request for review was denied by an undated letter. (R. 10-11.) The index to the administrative record states that the date of this letter was August 16, 2002. (R. 2.) Plaintiff argues that a twenty-five month period constitutes an "unconscionable" delay, and requests that the case be disposed of by the entry of judgment rather than a remand. *See, e.g.,* Pl.'s Mem. at 11.

The parties have each filed a motion for summary judgment [dkt 15, 17], and have consented to the jurisdiction of a Magistrate Judge. [Dkt 5, 6.]

## BACKGROUND

### I. Personal History

Plaintiff was forty-eight years old at the time of the hearing before the ALJ in 2000. (R. 42.) He testified at the hearing that he had completed the tenth grade. (*Id.*) In a disability report he indicated that he received a GED. (R. 286.) In another such form he indicated that he had completed 12th grade. (R. 331.) At the hearing he testified that he had attempted a GED but did not think he

had received one. (R. 53.) One of Plaintiff's physicians, Dr. Ivanovic, described him as a "very poor historian." (R. 699.)

Plaintiff's work history includes work as a laborer at a steel foundry (R. 43-44), a maintenance man for Chrysler (R. 47-48, 53), and as a laborer in advertising, putting up billboards. (R. 49-50, 53.)

Plaintiff testified that although at one point he had used illegal drugs, he has had no drugs since "the '90's." (R. 56.) There is evidence in the record that he used illegal drugs shortly before his 1997 hospitalization. (R. 418.)


## II. Medical History

Plaintiff suffers from a number of medical conditions. His allegation of disability, however, is based on his history of heart attacks and prior open heart surgery. (R. 228.) On February 25, 1997, Plaintiff was hospitalized at Hannibal Regional Hospital and diagnosed with a number of conditions including, but not limited to, congestive heart failure[2] and severe triple-vessel coronary artery disease including left main coronary artery stenosis with more than moderate left ventricular systolic dysfunction.[3] (R. 384.) Plaintiff was transported on March 4, 1997 to St. Louis University for further coronary artery intervention by bypass surgery. (R. 387.) Plaintiff's principal diagnosis at St. Louis University Hospital was "coronary atherosclerosis of native coronary vessel." (R. 417.)

---

[2]Congestive heart failure results from the inability of the heart to maintain sufficient blood supply to and drainage from the body as a whole or the lungs. J. E. Schmidt, *Attorneys' Dictionary of Medicine* Vol. 2, C-415 (Matthew Bender, December 2002).

[3]Coronary artery disease is a progressive narrowing of the channels of the coronary arteries that reduces the amount of oxygen available to the heart muscle. *Attorneys' Textbook of Medicine* ¶ 30.50 (Roscoe N. Gray and Louise J. Grady eds., 3d ed., Matthew Bender 2003).

He underwent a coronary artery bypass graft[4] and was discharged on March 10, 1997. (R. 419-420.)

On March 14, 1997, Plaintiff was admitted to the Hannibal Regional Hospital with "fever, nausea and vomiting, chills, abdominal pains and anorexia." (R. 439.) He was diagnosed with a gangrenous cecum.[5] (R. 442.) That condition may have been a result of his bypass surgery. (R. 64-65.) Plaintiff underwent a right hemicolectomy[6] at Hannibal Regional Hospital. (R. 471.) Plaintiff's doctors also suspected that he might be suffering from sarcoidosis.[7] (R. 450.) However, an April 16, 1997 progress notation from Hannibal Regional Hospital indicates that "[a]s far as the coronary artery disease is concerned the patient appears to be doing pretty good." (R. 481.) A May 13, 1997 progress note states that "he appears to be doing very well." (R. 480.)

A consultive examination was performed for the Bureau of Disability Determination Services ("DDS") by Dr. Rios on January 24, 1998. (R. 496.) The report of this examination notes that Plaintiff complains of "dyspnea on exertion after walking one block." (R. 496.) It further states that Plaintiff has been "chest pain free" since his discharge from St. Louis University Medical Center. (*Id.*)

---

[4]The coronary arteries surround the heart and supply its muscle walls with blood. Schmidt, *Attorneys' Dictionary of Medicine* at Vol. 2, C-416. A graft is the use of tissue to replace a deficiency in the body. *Id.* at Vol. 3, G-135.

[5]Gangrene is the death of tissue or part of the body. Gangrene can be caused by an insufficiency or stoppage of the blood supply and injury, infection, or disease. *Id.* at Vol. 3, G.-19. The cecum is the beginning of the large bowel. *Id.* at Vol. 1, C-127

[6]A hemicolectomy is the surgical removal of half, or about half, of the colon. *Id.* at Vol. 3, H-65.

[7]Sarcoidosis is a disease of unknown cause. While the disease frequently subsides spontaneously, it can result in severe impairment of the function of various affected organs. *Id.* at Vol. 5, S-28.

Plaintiff claims that he suffered another heart attack in December 1999, which necessitated two days of hospitalization. (R. 60-61.) Plaintiff testified that his heart is currently damaged. Plaintiff stated, "I got half a heart because the bottom of my heart is torn up. I mean, they had a video, and when he showed me the video, it's just like a rag." (R. 69-70.)

At the time of the hearing before the ALJ, Plaintiff was taking the following medications: Coreg,[8] Alprazplam,[9] Lipitor,[10] Hydrochlorothiazide,[11] Zestril[12] and Ibuprofen.[13] (R. 8; 770-772.) Plaintiff testified that he suffered side effects from his medication including dizziness, difficulty breathing, difficulty sleeping and skipping in his heartbeat. (R. 68.)

At the time of the hearing Plaintiff was being treated by two doctors, his internist, Dr. Dunn, and Dr. Ivanovic.[14] (R. 62.) While Plaintiff, the Commissioner and the ALJ refer to Dr. Ivanovic as a cardiologist, (R. 61-62; Def.'s Mem. at 4), the record contains a printout from the American Medical Association Directory of Physicians in the United States which indicates that Dr. Ivanovic's

---

[8]Coreg is the proprietary name for Carvedilol, which is used in the treatment of hypertension. *Id.* at Vol. 1, Cum. Supp. 15-16.

[9] Alprazolam is a proprietary name for Xanax and is used for the treatment of anxiety and panic disorders. *Id.* at Vol. 1, A-257.

[10] Lipitor is the proprietary name for Atorvastatin, which is used to lower cholesterol. *Id.* at Vol. 3, L-139.

[11] Hydrochlorothiazide is used to stimulate the production of urine. *Id.* at Vol. 3, H-202.

[12] Zestril is used to treat hypertension. *Id.* at Vol. 6, Z-4.

[13] Ibuprofen is used to ally inflammation. *Id.* at Vol. 3, I-3.

[14]The ALJ appears to consider Dr. Ivanovic an examining, rather than treating, physician. (*See* R. 19.) In his letter, however, Dr. Ivanovic states that he has prescribed medication for Plaintiff. (R. 700.) That raises the issue of whether Dr. Ivanovic should be considered a treating physician for purposes of the Social Security Regulations.

primary speciality and board certification is in internal medicine. (R. 765.)

In an April 30, 1999 letter to Dr. Dunn, Dr. Ivanovic states that he is starting Plaintiff on Coreg and making other alterations to Plaintiff's medications. (R. 700.) The letter further states, "Presently, [Plaintiff] is clearly functional Class I status,[15] although dyspnea on exertion is the limitation. I cannot elicit any concrete angina[16] and the chest pain seems to centers (sic) mostly around the incision and with muscularskeletal features." (R. 699.)

A May 14, 1999 cardiac report was completed by Dr. Dunn for the DDS. (R. 702-705.) Dr. Dunn indicated that Plaintiff's then- current New York Heart Association class rating was Class I. (R. 703), an apparent improvement from June 1997 when a progress note from Hannibal Regional Hospital indicated the following assessment: "Severe left ventricular systolic dysfunction from previous myocardial infactions with a suboptimal compensation. New York Heart Classification Class II to III. CCSC Class I." (R. 479.) Dr. Dunn's report also noted that Plaintiff suffered chest

---

[15]"The New York Heart Association (NYHA) Functional Classification for congestive heart failure depends upon the amount of physical activity the patient is able to perform without experiencing symptoms of fatigue or dyspnea. A patient who is able to ascend one flight of stairs without symptoms, or walk one block with a mild to moderate incline is classified as a NYHA Class I. Class II is assigned if the same amount of activity results in excessive fatigue, dyspnea, and /or angina pectoris (heart pain). Patients with severe limitation of activity are classified as Class III: Marked limitation of physical activity; comfortable at rest, but less than ordinary activity, such as walking from the kitchen to the living room, causes fatigue, dyspnea, or angina. Class IV means that a patient is unable to carry on any physical activity without symptoms; symptoms are present at rest and with any physical activity symptoms are increased. *Attorneys' Textbook of Medicine* ¶ 30A.21 (Roscoe N. Gray and Louise J. Grady eds., 3d ed., Matthew Bender 2003).

[16]Angina can mean an attack of choking and suffocation which may result from any of a number of causes. It can also refer to angina pectoris, which is a group of symptoms including chest pain, breathlessness, apprehension and sweating, that result from a sudden contraction of the smaller arteries which supply blood to the heart muscle. Schmidt, *Attorney's Dictionary of Medicine* at Vol. 1, A-358-359.

discomfort that was variable in duration and frequency. (R. 703.) Dr. Dunn further reported that Plaintiff was feeling better as a result of being on medication. (*Id.*) He also noted the medications that Plaintiff was taking, and stated that "[the patient] should not do heavy lifting, exertion etc." (R. 703, 705.) When asked to describe Plaintiff's ability to perform "activities of daily living," Dr. Dunn stated that "climbing one flight of stairs would be difficult [otherwise] no problems." (R. 704.)

The record contains the results of a number of tests. These include two exercise echocardiograms[17] dated March 3, 1997 and June 10, 1997. (R. 403, 484-495.) The conclusion of the June 10, 1997 exam was "significant limitation of exercise tolerance to the existing left systolic dysfunction but no significant exercise induced reversible myocardial ischemic."[18] (R. 485.) The record also contains the results of a series of tests in 1999, including an April 7, 1999 electrocardiographic exercise test.[19] (R. 682, 752.) These tests indicated ischemic heart disease, reversible ischemic and the possibility of critical stenosis.[20] (R. 752.) However, Plaintiff "was able to exercise to a heart rate of 137 without the development of symptoms." (R. 682.)

Other tests in the record include a March 3, 1997 ultrasound showing a mass that is reported

---

[17] An echocardiogram is an outline of the heart prepared by the use of ultrasound. *Id.* at Vol. 2, E-11.

[18] Myocardial means relating to the myocardium, the muscle of the heart. *Id.* at Vol. 4, M-333. Ischemic means pertaining to, or affected by, diminution in the blood supply. *Id.* at Vol. 3, I-205.

[19] An electrocardiograph is a machine which records electric currents generated by the heart muscle. *Id.* at Vol. 2, E-44.

[20] Stenosis is an abnormal narrowing of a body passage, opening or duct. *Id.* at Vol. 5, S-290.

to be most consistent with a hematoma[21] (R. 410), and the interpretation of a January 24, 1998 x-ray, which states that there is "no evidence of acute cardiopulmonary disease" and lists an impression of "mild cardiomegaly without signs of congestive heart failure." (R. 511.)

A number of Residual Functional Capacity ("RFC") assessments have been made of Plaintiff. In 1995, a physical RFC (R. 170-177), two Psychiatric Review Technique forms (R. 178-186; 199-207), and a mental RFC (R. 194-196), were completed. In September 1997, a physical RFC was completed by DDS.[22] (R. 7, 488-496.) That RFC stated that Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently (R. 489), could stand at least two hours and sit about six hours in an eight hour day (*Id.*), and was capable of occasional climbing and frequent balancing, stooping, kneeling, crouching and crawling. (R. 490.) Plaintiff was required to avoid concentrated exposure to extreme heat and cold. (R. 492.)

In February 1998, another physical RFC of Plaintiff was completed by an apparent non-examining medical consultant for the DDS.[23] (R. 7; 512-519). That RFC was apparently confirmed by Dr. W.B. Donnelly in April 1998, who stated that he reviewed the evidence but did not state that he examined Plaintiff. (R. 512.) According to the February 1998 RFC, Plaintiff was limited to occasional lifting of twenty pounds and frequent lifting of ten pounds. (R. 513.) Plaintiff was able

---

[21]A hematoma is a mass or localized collection of blood confined within a space of the body resulting from a ruptured blood vessel or a tumor or swelling of a tissue caused by a collection of clotted blood within the tissue. *Id.* at Vol. 3, H-58.

[22] The signature of the physician who completed the form is illegible and the physician is not identified in the list of exhibits accompanying the certified administrative record.

[23]The signature of the physician who completed the form is also illegible and the physician is likewise not identified in the list of exhibits accompanying the certified administrative record.

to stand, walk or sit about six hours in an eight hour day. (*Id.*) Plaintiff was capable of occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 514.)

On May 4, 1999, a physical RFC was completed by Plaintiff's treating physician, Dr. Dunn. (R. 707-714.) According to that RFC, Plaintiff was limited to lifting less than ten pounds even occasionally, and could stand or walk for less that two hours in an eight hour workday and sit for about six hours in an eight hour workday. (R. 708.) Plaintiff could never climb, balance, stoop, kneel, crouch or crawl. (R. 709.) The RFC notes that it is "unclear how environmental extremes may affect [Plaintiff's] symptoms." (R. 711.)

On September 6, 1999, a physical RFC was completed by non-examining consulting physician Dr. Patey for the DDS. (R. 8; 756-763.) That RFC concluded that Plaintiff was capable of occasionally lifting twenty pounds and frequently lifting ten pounds. (R. 757.) It further concluded that Plaintiff was capable of standing or walking at least two hours in an eight hour day and sitting about six hours in an eight hour day. (*Id.*) It stated that Plaintiff was limited to occasional balancing, stooping, kneeling, crouching, crawling and climbing of ramps, stairs and ladders. (R. 758.) It stated that Plaintiff should never climb ropes or scaffolds (*Id.*), and should avoid concentrated exposure to extreme cold and any exposure to machinery and heights. (R. 760.) Dr. Pately noted that his RFC differed significantly from that of treating physician Dr. Dunn and concluded that Dr. Dunn's RFC was more restrictive than the reports in the file warrant. (R. 762.)

Plaintiff testified that he could not lift more than nine pounds. (R. 57.) He stated that he can stand and sit comfortably for only an hour. (R. 58.) He was uncertain how long he could sit if he were able to change positions every hour. (*Id.*) Plaintiff testified that he cannot walk comfortably beyond approximately half a block. (R. 59.)

At the hearing the ALJ asked the vocational expert ("VE") a series of hypothetical questions. In his first hypothetical the ALJ posed the following: "Assume a hypothetical person of the [Plaintiff's] age, education and work history. If I were to find that person could meet the demands of sedentary work and of light work, but should avoid exposure to extreme cold, what is your opinion of said person's ability to engage in substantial gainful activity?" (R. 81.) The VE replied that there would be a large range of jobs totaling over 100,000 available in the Chicago primary metropolitan statistical area. (R. 82.) The ALJ then added to his hypothetical a restriction on the ability of the person to climb, balance, stoop, kneel, crouch and/or crawl more than occasionally. (R. 83.) The VE testified that this would have a "very minimal" effect on the number of jobs available, reducing it by ten percent. (*Id.*) The ALJ then added the additional hypothetical restriction of no use of ropes, scaffolds or work with or near hazardous machinery. (*Id.*) The VE stated that this restriction would further reduce the number of some positions. (*Id.*) The ALJ then asked the VE whether, if the ALJ were to credit all of Plaintiff's testimony and apply it to the hypothetical person, that person would be able to work. (*Id.*) The VE concluded that such a person would be unable to sustain employment based on his difficulty sleeping and breathing, which the VE felt would put into doubt Plaintiff's ability to maintain a consistent work pace, attend work regularly and concentrate even on simple tasks. (R. 83-84.) On cross-examination the VE appeared to concede that if the ALJ were to credit only Plaintiff's testimony about his dizziness, Plaintiff would be unemployable. (R. 85.) Later, however, the VE reasserted that he was considering all of Plaintiff's alleged side effects together. (R. 86.) The VE also stated that if Plaintiff could not lift ten pounds, he would be unemployable regardless of other symptoms. (R. 87.) Finally, the VE concluded that if Plaintiff could never stoop, as opposed to stooping occasionally, he would be unemployable. (R. 88.)

## THE ALJ'S OPINION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520 (2003). Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity, despite his impairment, to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering his residual functional capacity together with his age, education, and work experience. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Id.*

At step one the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of his disability. (R. 17.) At step two the ALJ found that Plaintiff's impairments were severe. (*Id.*) At step three the ALJ found that none of Plaintiff's impairments, singly or in combination, met or equaled a listed impairment. (*Id.*) The ALJ concluded that Plaintiff had the RFC to preform light work activity. (R. 18, 20.) Such work involves "lifting no more than 20 pounds at a time with frequent lifting and carrying of up to 10 pounds and walking, standing or sitting as much as six hours out of an 8-hour workday." (R. 20.) The ALJ further found: "Plaintiff

11

has additional postural limitations preventing him from ever climbing ropes or scaffolds and only occasionally climbing, balancing, stooping, kneeling crouching or crawling. He also cannot work at unprotected elevations or around dangerous moving machinery." (*Id.*) At step five the ALJ found, based on the testimony of the VE, that there were a significant number of jobs that Plaintiff could preform. (R. 21.)

The ALJ stated that he did not find Plaintiff's testimony credible. (R. 20.) That finding was based on Plaintiff's allegation of symptoms that "are not supported by objective medical findings." (*Id.*) In particular, the ALJ concluded that Plaintiff's alleged degree of limitation due to cardiac problems, dizziness, degree of chest pain and "the inability to perform any activity" are not documented in the treatment records. (*Id.*) In addition, the ALJ noted that Plaintiff alleged difficulty sleeping as a side effect of his medication but did not report that side effect to his physician. (*Id.*)

In assessing Plaintiff's RFC the ALJ considered the May 1997 follow-up at Hannibal Regional Hospital; the June 10, 1997 electrocardiographic evaluation; the June 25, 1997 follow-up at Hannibal Regional Hospital; the May 1999 cardiac report of Dr. Dunn and the March 1999 echocardiogram referenced therein; the electrocardiographic exercise test of April 7, 1999; the report of Dr. Ivanovic; and the report of Dr. Patey, the state agency physician. (R. 18-19.)

However, the ALJ did not give any weight to the RFC report prepared by Dr. Dunn. With respect to that report, the ALJ stated that he "did not credit Dr. Dunn's opinion regarding the claimant's disability. The opinion regarding whether a claimant is disabled or not is an issue reserved for the Commissioner and as such, I did not give Dr. Dunn's opinion regarding the claimant's disability any weight." (R. 21.) Instead, the ALJ "found the conclusion of the state agency physician persuasive as to the claimant's abilities." (R. 19.)

12

# LEGAL STANDARD

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. The role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F.Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d 178, 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) ("[t]he ALJ has the authority to assess medical evidence and give

greater weight to that which he finds more credible"). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F.Supp. 561, 566 (N.D. Ill. 1996). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, this does not mean that the ALJ is entitled to unlimited judicial deference. Regardless of whether there is adequate evidence in the record to support the ALJ's decision, the ALJ must build an accurate and logical bridge from the evidence to his or her conclusions, because the court confines its review to the reasons supplied by the ALJ. *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the ALJ's decision, the decision cannot be upheld. *Id.* The ALJ must state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young* 957 F.2d at 393) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review). An ALJ's opinion cannot contain conflicting factual determinations. *Smith v. Massanari*, No. 00-C-7504, 2001 WL 936123 at *1-2 (N.D. Ill. Aug. 16, 2001).

## DISCUSSION

### I. The RFC Assessment.

Dr. Dunn, one of Plaintiff's treating physicians, completed a physical RFC regarding Plaintiff on May 4, 1999. (R. 707-714.) Dr. Dunn concluded that Plaintiff could lift less than ten pounds even occasionally, stand less than two hours and sit for about six hours in an eight hour work day. (R. 708.) Dr. Dunn further found that Plaintiff could *never* climb, balance, stoop, kneel, crouch or crawl. (R. 709.) The ALJ, however, concluded that Plaintiff had the RFC for light work, and that Plaintiff could lift up to twenty pounds occasionally, and walk, stand or sit for six hours out of an eight hour day. (R. 20.) In addition he found that Plaintiff could *occasionally* climb, balance, stoop, kneel, crouch and crawl. (*Id.*) The ALJ's decision not to credit Dr. Dunn's RFC was outcome-determinative because the VE testified that if Plaintiff were limited in the manner described by Dr. Dunn, there would not be significant employment available.

Plaintiff raises two arguments. First, Plaintiff argues that the ALJ erred in failing to consider Dr. Dunn's RFC as potentially controlling on the ultimate issue of whether Plaintiff was disabled. (Pl.'s Mem. at 9.) As discussed above, the ALJ stated that he "did not credit Dr. Dunn's opinion regarding the claimant's disability." (R. 21.) It is well-established that "a claimant is not entitled to disability benefits simply because her physician states she is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)(internal citation omitted); *See* 20 C.F.R. § 404.1527(e).

The significant point in this case, however, is that Dr. Dunn did not, in fact, opine that Plaintiff was "disabled." Dr. Dunn's RFC does not reach any conclusion about Plaintiff's ability to

work; it merely reports certain medical findings. *See* R. 707-714. Thus, the ALJ's ground for disregarding the RFC – that Dr. Dunn was attempting to usurp the Commissioner's role in determining disability – is not founded in fact.

Plaintiff also argues that the ALJ failed to comply with 20 C.F.R. § 404.1527(d)(2). (Pl.'s Mem. at 10.) Under that regulation, the ALJ must evaluate every medical opinion he receives. 20 C.F.R. § 404.1527(d)(2). A treating doctor's opinion will be given *controlling weight* when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). The ALJ must give "good reasons" for the weight given to a treating source's opinion. *Id.* When a treating opinion is not given controlling weight it is to be evaluated according to the length, frequency, nature and extent of that relationship, as well as its supportability, constancy with other evidence, specialization and other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(d).

In reaching his conclusion regarding Plaintiff's RFC, the ALJ did not discuss Dr. Dunn's RFC. While an ALJ may reject the opinion of a treating physician, he is required by the applicable regulations not only to consider that opinion but also to articulate why he rejected it. 20 C.F.R. § 404.1527(d). Here, the only reason given by the ALJ for rejecting Dr. Dunn's report is Dr. Dunn's purported usurpation of the Commissioner's decision. That reason is not supported by the record and certainly does not justify completely ignoring Dr. Dunn's medical opinions.

Likewise, the ALJ's discussion of the cardiac report by Dr. Dunn is insufficient. In that report Dr. Dunn states that "climbing one flight of stairs would be difficult" for Plaintiff. (R. 704.) Yet the ALJ does not discuss that conclusion, his reason for rejecting it, or any of the factors

16

identified in 20 C.F.R. § 404.1527(d). *See McGuinness v. Apfel*, No. 00 C 3452, 2000 WL 1785532 at *3 (N.D. Ill. Dec. 5, 2000)(Denlow, J.)("The ALJ did not consider the length, frequency, nature or extent of [the doctor's treatment of plaintiff]. Therefore it was improper for the ALJ to have rejected [the doctor's] opinions in their entirety.") These are factors the ALJ "must" consider. *Kilps v. Barnhart*, 250 F. Supp.2d 1003, 1012 (E.D. Wis. 2003). The ALJ failed to identify what evidence he felt was inconsistent with Dr. Dunn's opinions. *Id.* at 1013 ("The ALJ was, therefore, required to point to particular pieces of evidence in the record indicating that plaintiff's condition was not as severe as [the treating physician] believed. . . . I cannot supply a ground for the ALJ's decision that is not expressly provided for by the ALJ...")

The Commissioner offers a number of reasons why the ALJ might have rejected the conclusions reached by Dr. Dunn. (Def.'s Mem. at 9-10.) However, these are not reasons identified by the ALJ. It has been established that "[e]ven if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not built an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel*, 61 F. Supp.2d 798, 806, (N.D. Ill. 1999)(quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Because the ALJ failed to articulate any proper reason for rejecting Dr. Dunn's report, remand is required.

## II. The Credibility Determination.

In assessing Plaintiff's credibility the ALJ stated:

I did not find the claimant's testimony credible. He alleges symptoms which are not supported by objective medical findings. The degree of limitation he alleges due to the history of cardiac problems is not supported by the objective medical finding. Moreover, his allegation of dizziness, the degree of chest pain, the inability to perform any activity are not documented by treatment records of any treating or

examining physicians. The claimant alleges difficulty sleeping due to side effects of medication yet there is no indication in the record that he has reported any such side effects to his physicians or asked to be changed to different medications. For these reasons, I do not find the claimant's testimony creditable and not warranting any narrowing of this residual functional capacity.

(R. 20.)

The ALJ is required to examine the full range of evidence as it relates to Plaintiff's claim.

*Zurawski v. Halter*, 245 F.3d 881, 888 (7ᵗʰ Cir. 2001). In *Zurawski*, the ALJ failed to discuss

medical evidence that supported the plaintiff's allegation of pain. *Id.* As a result, the court found that

it was unable to determine if the ALJ had examined the full range of medical evidence. *Id.* A similar

problem exists in the present case. In evaluating Plaintiff's RFC, Dr. Dunn indicated that, in his

judgment, Plaintiff suffered from a medically determinable impairment and the severity and duration

of Plaintiff's symptoms was not disproportionate to Plaintiff's medically determinable impairments.

(R. 712.) The ALJ, however, concluded that Plaintiff "alleges symptoms which are not supported

by objective medical findings." (R. 20.) In reaching that conclusion, the ALJ failed to discuss Dr.

Dunn's RFC evaluation that bears directly on the issue. Similarly, the ALJ stated that the Plaintiff's

"allegations of dizziness . . . are not documented by treatment records of any treating or examining

physicians." (*Id.*) The ALJ did not, however, discuss Plaintiff's evidence that dizziness is a potential

side effect of the medications that Plaintiff is taking, specifically Coreg, Alprazolam,

Hydrochlorothiazide, Zestril, and Ibuprophen. (R. 770-772.) Nor does the ALJ address Dr. Dunn's

notation in his RFC that Plaintiff "is on medication that can cause orthostatic hypotension" and

should never climb, balance, stoop, kneel crouch or crawl.[24] (R. 709.) An ALJ is not required to

---

[24]Orthostatic hypotension is a condition in which blood pressure is low when a person is standing. Schmidt, *Attorneys' Dictionary of Medicine* at Vol. 4, O-101.

provide a written evaluation of every piece of evidence. *Diaz v. Chater*, 55 F.3d 300, 309 (7th Cir. 1999.) However, the ALJ cannot discuss only that evidence which favors the ALJ's conclusion and may not ignore entire lines of evidence. *Herron*, 19 F.3d at 333. In this case the ALJ has failed to demonstrate that he considered all of the relevant evidence regarding Plaintiff's credibility and the case must thus be remanded on this ground also.

### III.  The Testimony By The VE.

Plaintiff argues that the ALJ failed to address testimony of the VE that was favorable to Plaintiff. (Pl.'s Mem. at 15.)  At the hearing the VE testified that if the ALJ credited Plaintiff's testimony, Plaintiff would be unable to work. (R. 83.)  The VE also stated that if the ALJ adopted Dr. Dunn's RFC assessment that Plaintiff could not lift ten pounds occasionally or stoop then Plaintiff would be unemployable. (R. 87, 88.)  The ALJ did not adopt Dr. Dunn's RFC or fully credit Plaintiff's testimony.

*Conner v. Shalala*, 900 F. Supp. 994 (N.D. Ill. 1995), cited by Plaintiff, was a similar but slightly different situation.  In *Conner*, the plaintiff testified that he had a history of fainting at work. *Id.* at 997.  The VE testified if the plaintiff had the number of fainting instances he had testified to, he would be precluded from all of the work the VE had concluded would otherwise be available. *Id.* at 1003.  The ALJ failed to address this testimony in her opinion, and there is no indication in  the *Conner* opinion that the ALJ ruled in any respect on the credibility of the plaintiff's testimony about fainting. *Id.*   The court in *Conner* stated that "[s]ince the VE's testimony in this case was determinative . . . [the ALJ's] failure to address the VE's concessions in cross-examination must be remedied." *Id.* at 1004.  Thus, in *Conner,* the ALJ's error was failing to make *any* finding on a

factual issue that, in light of the VE's testimony, was crucial to the ultimate conclusion.

In the present case, the ALJ found against Plaintiff on the factual issues that would support the VE's testimony favorable to the Plaintiff. However, as discussed in the preceding sections, the ALJ's conclusions on those factual issues cannot be sustained. Thus, on remand, the VE's conclusions must be evaluated in light of the new factual findings.


## IV. Remand to the Commissioner.

Plaintiff argues that "[t]he decision of the ALJ must be reversed and remanded for entry of a fully favorable decision because remand to the ALJ for a new hearing would only further delay Plaintiff's receipt of deserved benefits (after the Appeals Council sat on the matter for an unconscionable twenty-five months)." (Pl.'s Mem. at 11.) In support of his argument, Plaintiff cites *Olsen v. Apfel*, 17 F. Supp. 2d 783, 792 (N.D. Ill. 1998). In *Olson* the court concluded that "[b]ased on its careful review of the entire record . . . the evidence in support of a finding that Plaintiff is disabled . . . is overwhelming. Moreover it is not likely that any rational trier of fact would conclude on remand . . . that Plaintiff is not disabled." *Id.* The court observed that the deference owed to the decisions of the Commissioner favors remand when "the decision of the ALJ is not supported by substantial evidence but wherein further proceedings and proper analysis of the evidence could arguably lead to the same decision." *Id.* Finally, the court noted that a remand would "delay Plaintiff's receipt of deserved benefits," which had been applied for over four and a half years previously, without serving a useful purpose. *Id.*

After reviewing the evidence, this court concludes that remand is appropriate in the present case. Although Plaintiff's case unfortunately has been ongoing for a significant period of time,

resulting, in part, from a two-year delay between the decision by the ALJ and the decision of the Appeals Council, the conclusion here is not as evident as in the *Olsen* case. It is possible that on remand the ALJ may properly reach the conclusion that Plaintiff is not entitled to benefits.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for summary judgment is denied, Plaintiff's motion for summary judgment is granted, judgment is entered on behalf of Plaintiff, and the case is remanded to the Commissioner for further proceedings consistent with this opinion. This is a final and appealable order.


IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

September 26, 2003